THE STATE OF UTAH ex relatione M. A. BREE-DEN, Attorney-General, Relator, v. THOMAS D. LEWIS, Respondent.

No. 1472.    (72 Pac. 388.)

1. **Constitutional Law: Construction: Power of Legislature: Presumptions as to Validity.**
The power of the Legislature to legislate on all subjects and for all purposes of civil government is absolute, inherent, and plenary, except as limited or controlled by the Constitution of the State or of the United States; and, unless it acts in violation of constitutional restraint, the courts have no authority to declare its enactment void, however unnecessary or unwise it may be.[1]

2. **Same.**
In construing an enactment, where the question of its constitutionality is involved in difficulty and doubt, a court will be strongly inclined to resolve such doubt in favor of its validity, and it will be presumed to be valid until the contrary is shown beyond all reasonable doubt.[2]

3. **Same: Sess. Laws, 1903, p. 50, chapter 55, Valid.**
Constitution, article 8, section 5, reads: "The State shall be divided into seven judicial districts, for each of which at least one, and not exceeding three judges, shall be chosen by the qualified electors thereof." Section 6: "The Legislature may change the limits of any judicial district, or increase or decrease the number of districts, or the judges thereof." Section

---

[1] Kimball v. Grantsville City, 19 Utah 368, 45 L. R. A. 628; 57 Pac. 1.

[2] State v. Tingey, 24 Utah 225; 67 Pac. 33.

16: Until otherwise provided by law, the judicial districts of the State shall be constituted as follows: . . . Third District:—The counties of Summit, Salt Lake and Tooele, in which there shall be elected three district judges." Act approved March 12, 1903, Session Laws 1903, page 50, chapter 55, increases the number of judges in the Third Judicial District to four, empowers the Governor to appoint one judge, and fixes the first term of office. *Held*, that sections 5 and 16 were designed to have force and effect at the time of the election of officers and adoption of the Constitution, and "until otherwise provided by law;" and that the provision of section 6 was intended for permanent purposes, so that the act was a valid exercise of legislative power.

(Decided May 1, 1903.)

Original action in quo warranto instituted by the Attorney-General, on behalf of the State, to oust the defendant from the office of district judge of the Third Judicial District.

OUSTER DENIED.

*Hon. M. A. Breeden,* Attorney-General, and *Hon. W. R. White,* Deputy Attorney-General, for the State.

*Messrs. Frick & Edwards, Messrs. Pierce, Critchlow & Barrette, Messrs. Young & Moyle* and *Messrs. Sutherland, Van Cott & Allison* for respondent.

BARTCH, J.—In this case the Attorney-General filed an information in the nature of quo warranto, demanding that the defendant be ousted from the office of district judge of the Third Judicial District. This is an original proceeding in this court. The information states that the defendant was, on April 7, 1903, appointed to the office, by the Governor, in pursuance of an act entitled "An act to increase the number of judges for the Third Judicial District and for the appointment of one judge, pending the next general election," which was approved March 12, 1903 (Sess. Laws 1903, p. 50,

c. 55); that such appointee qualified, is in possession and attempting to discharge the duties of the office, and claims the emoluments thereof; that his appointment was unlawful; and that he has no legal authority to exercise the functions of the office, unlawfully holds the same, and will continue to do so, if not ousted. The defendant filed an answer admitting his appointment to the office and qualification, and that he has possession and is discharging the duties thereof. It is averred that he holds the office lawfully, exercises its functions, and is entitled to the emoluments thereof, by virtue of the act of the Legislature referred to in the information, and of his appointment thereunder. The plaintiff demurred to the answer upon the ground that it did not state facts sufficient to constitute a defense.

The contention on behalf of the State is that the act of the Legislature, above referred to, and under which the appointment was made, is *ultra vires,* being in conflict, as is urged, with sections 5 and 6, article 8, of the Constitution. That act is found in Sess. Laws 1903, c. 55, p. 50, and, so far as material here, reads as follows:

"Section 1. That from and after the passage and approval of this act, there shall be four District Judges in and for the District Court of the Third Judicial District of this State.

"Sec. 2. That the Governor be and is hereby authorized and required to appoint one District Judge, in and for the Third Judicial District, within thirty days after the passage and approval of this act, whose term of office shall be, until the first Monday in January, 1905, and until his successor is elected and qualified, as provided by law."

As will be observed the first section increases the number of judges in the Third Judicial District to four, and the second empowers the Governor to appoint one judge, and fixes the first term of office. It is claimed that the Constitution limits the number of district judges in the Third Judicial District to three, and that, therefore, the act, which increases the number to four, vio-

lates the fundamental law, and is void.   It must be conceded that, if such a limitation exists, the act is void, and must be declared so.   The question, then, is whether the Legislature transcended its power in this enactment. In determining this it must not be forgotten that that body exercises the functions of a co-ordinate branch of the state government.   It is within its province to make laws.   Its power to legislate upon all subjects and for all purposes of civil government is absolute, inherent, and plenary, except as limited or controlled by the Constitution of this State or of the United States.   Being invested with such power, unless it acts in violation of constitutional restraint, the courts have no authority to declare its enactments void, however unnecessary or unwise they may be.   "It is wholly within the discretion of the Legislature to determine whether, concerning any subject, such conditions or such facts and circumstances exist as to warrant it to act.   It is the sole judge as to whether an exigency, or such cause exists as requires the enactment of a law, and, in the absence of any constitutional restriction, if it makes a law, there is no authority in the government which can declare it void.   Independently of any repugnance between a legislative act and any constitutional limitation or restriction, a court has no power to arrest its execution, however unwise or unjust, in the opinion of the court, it may be, or whatever motives may have led to its enactment."   Kimball v. Grantsville City, 19 Utah 368, 383-384, 57 Pac. 1, 45 L. R. A. 628.   So, an enactment of the Legislature embraces within itself, by implication, a construction by a co-ordinate branch of the government, of the constitutional provisions relating to the subject of the legislation.   Therefore a court, in construing the enactment, where the question of its constitutionality is involved in difficulty and doubt, will be strongly inclined to resolve such doubt in favor of its validity, and out of respect to the wisdom and integrity, loyalty and patriotism of the Legislature, its enactment will be presumed to be valid, until the

contrary is shown beyond all reasonable doubt. In State v. Tingey, 24 Utah 225, 230, 67 Pac. 33, Mr. Justice Baskin, speaking for the court, said: "When the Legislature, by enactments, either impliedly or expressly construes a provision of a statute or a constitution, in doubtful cases the courts will accept the legislative construction, and enforce the provision in accordance therewith, if the ambiguous language of the provision is such as admits of such construction." Ogden v. Saunders, 12 Wheat. 213, 270, 6 L. Ed. 606; Grenada County Supervisors v. Brown, 112 U. S. 261, 268, 5 Sup. Ct. 125, 28 L. Ed. 704.

It now becomes important to determine whether, in the light of these principles, the present enactment was made in violation of constitutional limitation. The provisions of the Constitution material to this decision, the same being found in article 8 thereof, read as follows: "The State shall be divided into seven judicial districts, for each of which, at least one, and not exceeding three judges, shall be chosen by the qualified electors thereof." Section 5. "The Legislature may change the limits of any judicial district, or increase or decrease the number of districts, or the judges thereof." Section 6. "Until otherwise provided by law, the Judicial Districts of the State shall be constituted as follows: . . . Third District:—The counties of Summit, Salt Lake and Tooele, in which there shall be elected three district judges." Section 16. Was the Legislature inhibited by these provisions of the paramount law, from passing an act increasing the number of district judges to four in the Third Judicial District? The Attorney-General says it was, and, if this be true, then the act in question is void, and the construction which the Legislature put upon the constitutional provisions, is erroneous and must be discarded. If the provision in section 5 were to be considered independently of the others, and given general effect, without considering the conditions under which it was adopted, it would be clear that the number of judges of that district could never be increased, ex-

State ex rel. v. Lewis.

cept by constitutional amendment. The several provisions, however, are *in pari materia,* and, under well-known rules of interpretation, must be construed together, and each given effect and operation, if possible; and in construing them the court should be mindful of the circumstances and conditions under which they were drafted and adopted by the framers of the Constitution. The interpretation insisted upon by the State would not only render section 5 repugnant to section 6, but would render useless and ineffective the words, "or the judges thereof," employed in the latter section. This would violate a cardinal principle of constitutional construction, which is that, if possible, the whole instrument—every section, every clause, every word—must be given effect. Where provisions seem to conflict, a construction which will harmonize them, if practicable, will be adopted, and in construing them it must be presumed that the framers of the instrument used the words in their ordinary and natural sense. One provision of a constitution will not be permitted to defeat another if by any reasonable interpretation, both can be given effect. "If any section of a law be intricate, obscure, or doubtful, the proper mode of discovering its true meaning is by comparing it with the other sections, and finding out the sense of one clause by the words or obvious intent of another. And in making this comparison it is not to be supposed that any words have been employed without occasion, or without intent that they should have effect as part of the law. The rule applicable here is that effect is to be given, if possible, to the whole instrument, and to every section and clause. If different portions seem to conflict, the courts must harmonize them, if practicable, and must lean in favor of a construction which will render every word operative, rather than one which may make some words idle and nugatory. This rule is applicable with special force to written constitutions, in which the people will be presumed to have expressed themselves in careful and measured terms, corresponding with the immense importance of

the powers delegated, leaving as little as possible to implication." Cooley's Const. Lim., pp. 71-74.

When the Constitution was framed, there was in existence a territorial form of government, with laws suited to that government. The Territory had been divided into four judicial districts, and one judge presided over each district. Thus confronted with governmental facilities, which were regarded no longer suitable to a prosperous and growing section of country, the convention, assembled for that purpose, drafted the Constitution, and it must be construed in view of the necessities and conditions which impelled the change of government, and in view of the objects sought to be achieved. "Constitutions," says Judge Dillon (1 Dill. Mun. Corp., sec. 3a), "are not to be interpreted alone by their words abstractly considered, but by their words read in the light of the conditions and necessities in which the provisions originated, and in view of the purposes sought to be attained and secured." The territorial form of government was to be abrogated, and a state form at the same time created and instituted. The object was to make the government for the State complete and operative from the very time of the taking effect of the Constitution. The new government necessarily had to be effective before its legislative branch could act. The Constitution, therefore, had to be so framed as to give life and power to the government in the meantime, and, to effectuate such result, it was necessary to provide for officers to be chosen at the same time of the adoption by the people of the Constitution, and, in addition to providing for a permanent government, to make some temporary provisions to enable such officers and the various departments of the government, to perform their functions. The provisions of the Constitution therefore may obviously be divided into two classes: First, those for temporary purposes, which were intended to control and be operative, and to constitute the rule of action, from the time the Constitution took effect until such time that the legislative depart-

ment might by law provide otherwise; and, second, those for permanent purposes, which were intended to remain operative and binding upon the lawmaking power, as well as the other departments of the government, until changed by the sovereign power in the manner provided by the Constitution itself.   The former class may, therefore, be superseded and rendered inoperative by legislative enactment; but the latter may not, because the constitutional provisions, which fall within the latter class, constitute permanent limitations upon the plenary and absolute power which, we have seen, the Legislature possesses, in the absence of constitutional restraint. Construing the several provisions quoted together, and in view of the general and obvious plan of the Constitution with reference to temporary and permanent provisions, it seems clear that the provision from section 5 falls within the first class referred to, and that it was intended to control in the election of judges who were elected at the time of the adoption of the Constitution, and to remain effective until changed by the Legislature, as provided in section 6, immediately following.   Confronted, as we have seen, by existing conditions, and acting for a prosperous people, and a growing and resourceful State, the framers of the Constitution evidently intended the provision in section 5 for temporary purposes, and the one in section 6 as a permanent provision respecting legislative power.   They manifestly considered that the number of districts and judges, provided for in section 5 was sufficient under the then existing conditions and circumstances, and intended, by the provisions of sections 6 and 16, to leave it within the power of the legislative department of the state government to change the limits of any or all of the districts, or for any district where there might be but one judge, to provide by statute for more than one, or, where any district might have more than one judge, to increase or decrease the number, as the increase or decrease of population and legal business and the growth and development of the State might require.   Such a

design on the part of the framers of the fundamental law is certainly in accord with proper forethought, business sagacity, common sense, and sound judgment.

The position that the provision of section 6 as to the increasing or decreasing of the number of judges should be construed so as to apply only to six of the seven districts provided for in section 5, whose limits are defined in section 16, and not to the Third District, mentioned in the last section, is not tenable. It violates the familiar rules of constitutional construction that the words employed in the instrument must be given their natural and ordinary meaning, unless a different meaning is indicated by the context; and that effect must be given, if possible, to every section and clause. Nothing appears from the context to show that a different meaning was intended, and, as we have seen, it is possible, by another perfectly rational construction, to give force and effect to each of the several provisions in controversy.

Upon careful examination of the several provisions in question in the light of other provisions of the Constitution, and of the conditions which confronted the framers of that instrument, the conclusion is irresistible that sections 5 and 16 were designed to have force and effect at the time of the election of officers and adoption of the Constitution, and "until otherwise provided by law"—that is, until superseded and changed by legislative enactment; and that the provision of section 6 was intended for permanent purposes.

The interpretation which we have thus placed upon the organic law is warranted not only by the principles of constitutional construction, but also is manifestly in harmony with and justified by that decent respect due to the wisdom, honesty, and patriotism of the framers of the instrument and of the sovereignty that adopted it. So the construction as to these provisions of the organic law, and the conclusion reached, are in harmony with the doctrine announced in the case of State v. Tingey, supra, where similar principles were dis-

cussed and applied, and that case must be regarded as controlling authority herein upon this point.    Likewise this construction is in harmony with that placed upon these provisions by the Legislature.

The final question is, under such interpretation, is the act in question a violation of the Constitution?    We think not.    The act does not appear to be violative

3    of constitutional restraint.    An examination and comparison of it with the provisions of the paramount law do not appear to manifest a conflict, but, even if it were admitted that its constitutionality were in doubt, then, as we have seen, such doubt would have to be resolved in favor of the validity of the act.

We are of the opinion that the enactment by virtue of which the defendant was appointed, and in pursuance of which he qualified, is discharging the duties of the office, and claiming the emoluments thereof, was a valid exercise of legislative power, and that the prayer of the Attorney-General to oust the incumbent from the office must be denied.

It is so ordered.

BASKIN, C. J., and McCARTY, J., concur.